UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DONNA POLYNICE,

                               Plaintiff,

        v.                                  8:12-CV-1381
                                                (DNH/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                               Defendant.

_____

MARK A. SCHNEIDER, ESQ., for Plaintiff
REBECCA H. ESTELLE, Special Ass't U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the

Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. §

636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General

Order 18.

## I.    PROCEDURAL HISTORY

Plaintiff "protectively filed" an application for Supplemental Security Income

("SSI") on June 24, 2008 and one for disability insurance benefits on June 26, 2008,

claiming disability since February 1, 2006. (Administrative Transcript ("T.") at 90,

211-13, 214-20).[1] Plaintiff's application was initially denied on January 28, 2009 (T.

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing"
indicates that a written statement, "such as a letter," has been filed with the Social Security
Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§
404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper
statement is filed, the Social Security Administration will use the date of the written statement as the
filing date of the application even if the formal application is not filed until a future date.

90, 156-63), and she requested a hearing before an Administrative Law Judge ("ALJ") (T. 90, 165-66). The hearing, at which plaintiff and a vocational expert testified, was conducted on May 20, 2010. (T. 90, 105-52).

In a decision dated June 16, 2010, the ALJ found that plaintiff was not disabled. (T. 90-101). On December 15 and 21, 2011, plaintiff's counsel submitted updated medical records to the Appeals Council. (T. 14-86). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on July 26, 2012. (T. 1-6). The Appeals Council received the additional medical records submitted on plaintiff's behalf and made them part of the record. (T. 6). However, the Council concluded that the submitted records related to a time period after the ALJ's disability determination and concluded they did not effect the decision as to whether plaintiff was disabled as of June 16, 2010. (T. 2).

Plaintiff filed her brief in this action on January 24, 2013. (Dkt. No. 11). On April 8, 2013, plaintiff's counsel submitted additional medical records reflecting treatment of plaintiff's left foot between September 27, 2010 and May 22, 2012, and asked that they be added to the record on appeal. (Dkt. No. 14). The court provided defendant additional time to file a responsive brief, so that the submission of new evidence could be addressed. (Dkt. Nos. 15-18).

On September 30, 2013, plaintiff filed a supplemental letter brief advising the

court that plaintiff had reapplied for SSI benefits and that, on September 23, 2013, she was found disabled by the Commissioner, with an onset date of January 28, 2013. Plaintiff argued that this court should take the recent determination of disability into account and order a remand of the earlier decision denying benefits. (Dkt. No. 19). On October 1, 2013, the Commissioner filed a letter brief, arguing that the recent determination was not probative of the issue in this case–whether plaintiff was disabled through the date of the ALJ's decision on June 16, 2010. (Dkt. No. 20). Plaintiff filed a reply on October 2, 2013. (Dkt. No. 21).

## II. OVERVIEW OF THE EVIDENCE

Plaintiff claimed to be disabled, as of February 1, 2006, by a variety of impairments, including severe pain in her knees, back, and feet caused by, *inter alia*, osteoarthritis and complicated by her morbid obesity; anxiety and depression; carpal tunnel syndrome; and asthma. At the time of the administrative hearing in May 2010, plaintiff was 47 years old, 5' 4" tall, and weighed approximately 245 pounds. (T. 109-10). She is the mother of three grown children and lived alone in an apartment. (T. 109, 111). Plaintiff earned her GED, completed a two-year child care training program in one year, and was attending community college at the time of the hearing. (T. 111-12, 114). She worked part-time caring for three children in their home, and had prior employment experience as certified nurse assistant doing home health services from 2003 through 2006. (T. 114-16). Plaintiff, with some

difficulties, was able to attend to her personal care, cook meals, maintain her apartment, drive an automobile every day, do her own shopping, visit with family and friends, regularly attend religious services, and do hobbies and volunteer work. (T. 126-29).

Plaintiff's brief (at 1-16) provides a detailed summary of the medical and other evidence of record, which the defendant's brief (at 1, Dkt. No. 18), adopts, "with the exception of any inferences, arguments, or conclusions." Rather than rehash the evidence in this case at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## III.  GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he/she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or

whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. § 404.1520 (disability insurance benefits) & § 416.920 (SSI). The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)

(citing, *inter alia*, Johnson *v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his/her findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Williams*, 859 F.2d at 258.

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v.*

*Astrue*, 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV. THE ALJ'S DECISION

In the ALJ's June 16, 2010 decision, he acknowledged that plaintiff met the insured status requirements of the Social Security Act through March 31, 2011, and determined that plaintiff had not been engaged in substantial gainful activity since February 1, 2006–the alleged disability onset date. (T. 92). Then, the ALJ found that plaintiff's bilateral knee disorder, back disorder, heel spurs, asthma, obesity, and adjustment disorder were severe impairments, but did not meet or equal an impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (T. 92-94).

Next, the ALJ determined plaintiff had the residual functional capacity ("RFC") to perform significantly less than the full range of sedentary work, incorporating a number of specific work-related limitations relating to her various impairments. (T. 94-99). The ALJ found that claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the

extent they were inconsistent with the ALJ's RFC assessment. (T. 96, 97).[2] He concluded that there were no medical source statements from any treating physician that would support further restrictions than those the ALJ incorporated into his RFC determination. (T. 99).

Given his RFC determination, the ALJ then found that Plaintiff was incapable of performing her past relevant work as a nurse's assistant. (T. 99). However, relying on the testimony of the vocational expert, to whom the ALJ posed hypothetical questions, the ALJ determined that plaintiff could perform other jobs existing in significant numbers nationally. (T. 99-100). Accordingly, the ALJ found that the plaintiff was not disabled within the meaning of the Act. (T. 100).

## V.    ISSUES IN CONTENTION

The plaintiff makes the following claims:[3]

1.    The ALJ erroneously failed to determine that plaintiff's knee problems, considered in combination with her morbid obesity, met or equaled the criteria of "listed" impairments under Listings 1.02 and/or 1.03. (Pl.'s Brf. at 22-24, 30-32).

2.    Given the combination of her physical impairments, pain, obesity, and mental limitations, the ALJ erred in determining plaintiff's RFC because, *inter alia*, he improperly assessed plaintiff's credibility and misapplied the treating physician rule. (Pl.'s Brf. at 18-22, 24-32).

3.    The ALJ improperly determined that there are jobs in the national

---

[2] The ALJ found that plaintiff's testimony as to her limitations as a result of her knee problems, complicated by obesity, were credible, and incorporated those limitations into his RFC assessment. However, the ALJ concluded that plaintiff's complaints of chronic back pain since 2005 were not supported by the medical record. (T. 97).

[3] The court has reorganized plaintiff's claims in the order that they will be addressed below.

economy that plaintiff can do because he did not resolve inconsistencies between the testimony of the Vocational Expert and the Dictionary of Occupational Titles and because his hypothetical questions to the expert did not accurately depict the scope of plaintiff's limitations. (Pl.'s Brf. at 32-36).

4.      This court should add the newly-submitted medical evidence to the record on appeal and consider it in connection with the review of the ALJ's decision. (Pl.'s 4/8/2013 Letter Brf., Dkt. No. 14).

5.      This court should remand for a new hearing so that the Commissioner's recent determination that plaintiff was disabled as of January 28, 2013 can be considered in re-assessing whether plaintiff was disabled during the time period covered by the applications for benefits relevant to this case. (Pl.'s 9/30/2013 & 10/2/2013 Letter Brfs., Dkt. Nos. 19, 21).

This court concludes, for the reasons set forth below, that the ALJ and the Appeals Council did not err in their review of plaintiff's applications and the new evidence that she submitted. The court also finds that the ALJ met his burden of proof at step five of the sequential analysis, and that the determination that plaintiff was not disabled on or before June 16, 2010, was supported by substantial evidence. Accordingly, it is recommended that the decision of the Commissioner be affirmed and plaintiff's complaint dismissed.

## VI.    THE ALJ'S LISTINGS ANALYSIS

The ALJ concluded that the plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (T. 93-94). Plaintiff argues that the ALJ erred at step three of the sequential disability analysis by not explicitly considering whether plaintiff's knee, foot, and ankle problems, as complicated by her morbid obesity, met Listings 1.02 and/or 1.03. (Pl.'s Brf. at 22-

24, 32).  As discussed below, the ALJ's listings analysis implicitly concluded that

plaintiff did not satisfy the elements of listings 1.02 and 1.03, and there was

substantial evidence in the record to support that conclusion.

## A.    Applicable Law

### 1.    Listings

At step three of the disability analysis, the ALJ must determine if plaintiff

suffers from a listed impairment.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii),

416.920(a)(4)(iii).  It is the plaintiff's burden to establish that his or her medical

condition or conditions meet *all* of the specific medical criteria of particular listed

impairments.  *Pratt v. Astrue,* 7:06-CV-551 (LEK/DRH), 2008 WL 2594430 at *6

(N.D.N.Y. June 27, 2008) (*citing Sullivan v. Zebley,* 493 U.S. 521, 530 (1990)).  If a

plaintiff's "impairment 'manifests only some of those criteria, no matter how

severely,' such impairment does not qualify."  *Id.*

Listings 1.02(A) and 1.03 deal with musculoskeletal impairments related to

major weight-bearing joints, such as the knee.  See 20 C.F.R., Pt. 404, Subpt. P, App.

1, §§ 1.02(A), 1.03.  To meet listing 1.02(A), a claimant must have "[m]ajor

dysfunction of a joint," which is

> [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture,
> bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with
> signs of limitation of motion or other abnormal motion of the affected joint(s),
> and findings on appropriate medically acceptable imaging of joint space
> narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>
> > A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip,
> > knee, or ankle), resulting in inability to ambulate effectively, as defined
> > in 1.00B2b[.]

*Id.* § 1.02(A). Listing 1.03 concerns reconstructive surgery of a major weight-bearing joint and requires: "inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." *Id.* § 1.03.

"Inability to ambulate effectively" is defined in simple terms as "extreme limitation of the ability to walk." *Id.* § 1.00(B)(2)(b)(1). An individual who cannot walk without a walker, two crutches, or two canes; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; carry out routine ambulatory activities such as shopping and banking; and climb a few steps at a reasonable pace with the use of a single hand rail does not ambulate effectively. *See id.* § 1.00(B)(2)(b)(2).

### 2.    Obesity

Obesity is not in and of itself a "disability," but the Social Security Administration considers it to be a medically determinable impairment, the effects of which should be considered at the various steps of the evaluation process, including steps three and four. SSR 02-1p: "Titles II and XVI: Evaluation of Obesity," 2002 WL 31026506, 67 Fed. Reg. 57859, 57861 (Sept. 12, 2002).[4] "[W]hen determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation

---

[4] SSR 02-1p recognizes three levels of "obesity," based on Body Mass Index ("BMI"), which is a ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m 2). Fed. Reg. at 57860. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. *Id.*

process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(Q).

Notwithstanding the requirements of SSR 02-1p, "there is no obligation on an ALJ to single out a claimant's obesity for discussion in all cases." *Cruz v. Barnhart*, 04 CIV 9011, 2006 WL 1228581, at *9 (S.D.N.Y. May 8, 2006); *Mancuso v. Astrue*, No. 1:06-CV-930 (GLS), 2008 WL 656679, at *5-6 (N.D.N.Y. Mar. 6, 2008) (the ALJ did not err by failing to specifically address whether plaintiff's obesity was a severe impairment), *aff'd*, 361 F. App'x 176, 178 (2d Cir. 2010).   Furthermore, the ALJ may implicitly consider plaintiff's obesity in doing his listing and RFC analysis by relying on medical opinions which, although not specifically referencing limitations due to obesity, make overall assessments of plaintiff's limitation with clear awareness of her weight. *See, e.g., Paulino v. Astrue*, 08 Civ. 02813, 2010 WL 3001752, at *18-19 (S.D.N.Y. July 30, 2010) (although the ALJ failed to mention plaintiff's obesity when conducting step-three listing analysis, he satisfactorily considered the effects of plaintiff's obesity by relying on evaluations by doctors who accounted for the claimant's obesity) (collecting cases); *Drake v. Astrue*, 443 F. App'x 653, 657 (2d Cir. 2011) (the ALJ implicitly factored plaintiff's obesity into his RFC determination by relying on medical reports that repeatedly noted plaintiff's obesity and provided an overall assessment of her work-related limitations).

**B.    Analysis**

The ALJ did not specifically mention Listing 1.02 or 1.03 in his step-three

analysis, but did reference the severe arthritis in plaintiff's right knee. (T. 93). Elsewhere in his opinion, the ALJ noted that plaintiff's obesity complicated her knee impairment, and that she also had experienced foot pain associated with heel spurs. (T. 92-93, 97). The ALJ's listings analysis clearly referenced the conclusions of Dr. Wassef's December 2008 orthopedic examination of plaintiff, including the medical finding that plaintiff was able to ambulate with a normal gait and that she "can walk on heels and toes without difficulty." (T. 93, 287).[5] The ALJ's conclusion that the plaintiff had not presented medical evidence to satisfy the criteria of any listing–set forth in the same paragraph mentioning the arthritis in her knee and her ability to ambulate–constituted an adequate finding that plaintiff did not establish an "inability to ambulate effectively," as required to meet either Listing 1.02 or 1.03. As in *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112-13 (2d Cir. 2010), this is not a case "in which we would be unable to fathom the ALJ's rationale [for his step-three analysis] in relation to evidence in the record," and, therefore, there is no need . . . to remand this case to the ALJ for clarification).

There is substantial evidence cited in the ALJ's opinion and in the record that supports the ALJ's tacit conclusion that plaintiff's ability to ambulate is not so limited as to satisfy the elements of Listing 1.02 and 1.03. In addition to the findings of the examining orthopedic consultant referenced in the ALJ's step-three analysis, other sections of the ALJ's opinion note that plaintiff engaged in a wide range of

---

[5] The ALJ did not reference Dr. Wassef or the relevant exhibit number of the doctor's report in the ALJ's step-three analysis, but the ALJ explicitly attributed those findings to Dr. Wassef elsewhere in his report. (T. 97).

daily activities which require ambulation, including attending class and weekly religious services, shopping, cooking, house cleaning, doing laundry, and ironing. (T. 96, 98-99). *See, e.g., DiPalma v. Colvin,* 12 Civ. 6708, 2013 WL 3243554, at *3, 13-14 (S.D.N.Y. June 28, 2013) (holding that plaintiff who would likely require a knee replacement in the future, after he lost some weight, was not presumptively disabled under Listings 1.02 and 1.03 in part because the scope of his daily activities indicated that he could ambulate effectively) (collecting cases).[6] The ALJ noted that the plaintiff testified that, in the last five or six months after arthroscopic surgery on her left knee, she occasionally used a single cane to assist her when walking outside on rainy or damp days. (T. 96, 97, 119-20, 541, 560, 571).[7] As noted above, "inability to ambulate effectively" under Listings 1.02 and 1.03 requires that a claimant need a walker, two crutches, or two canes to assist in walking.

In support of plaintiff's argument that she is disabled under Listings 1.02 and 1.03, she points to medical records diagnosing the arthritis in her knees and foot

---

[6] *See also Frye ex rel. A.O. v. Commissioner of Social Sec.*, 5:10-CV-98 (GTS/ATB), 2010 WL 6426346, at *6 (N.D.N.Y. Nov. 12, 2010) (although the ALJ should have specifically addressed the relevant listings and provided a more direct rationale for his listing determination, there is substantial evidence in the ALJ's decision and in other credible medical reports which clearly indicates that the claimant's conditions did not meet or medically equal the two listed impairments suggested by plaintiff's counsel) (Report-Recommendation), *adopted,* 2011 WL 1301538, at *4 (N.D.N.Y. Mar. 31, 2011), *aff'd,* 485 F. App'x 484, 487-88 (2d Cir. June 13, 2012); *Batista ex rel. M.B. v. Astrue*, 08-CV-2136, 2010 WL 3924684, at *7 (E.D.N.Y. Sept. 29, 2010) (although the ALJ did not address specific Listings which plaintiff raised, a court may uphold an ALJ's conclusions despite the absence of an express rationale as long as the court can look to other portions of an ALJ's decision as well as the credible evidence to find the decision supported by substantial evidence) (*citing, inter alia, Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982).

[7] Impairments cannot be disabling unless they last or can be expected to last continuously for twelve months. 20 C.F.R. §§ 404.1509, 416.909

pain, but fails to reference any medical evidence indicating that her ability to ambulate was limited to the extent required to meet the listings. (Pl.'s Brf. at 23-24). Plaintiff testified that, due to her joint pain, she could only walk five to ten minutes; but, even accepting that testimony as accurate, it does not suggest a limitation on her ability to ambulate that would satisfy Listings 1.02 or 1.03. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2) (defining "inability to ambulate effectively" to include the inability to "walk a block at a reasonable pace on rough or uneven surfaces"). As discussed below, the plaintiff has made arguably inconsistent statements about her ability to ambulate, and the ALJ appropriately questioned the credibility of her testimony about the extent of her physical limitations.[8]

Plaintiff also suggests that the ALJ's step-three analysis is flawed because he failed to consider the effect of her obesity on her ability to ambulate. However, elsewhere in his opinion, the ALJ explicitly acknowledges that plaintiff's obesity complicated her knee problems. Moreover, the ALJ relied upon the findings of the consultative, examining orthopedist, who explicitly noted plaintiff's morbid obesity in his report. (T. 286). These references demonstrate that the ALJ appropriately factored-in plaintiff's obesity in his step-three analysis. *See, e.g., Drake v. Astrue*, 443 F. App'x at 657; *Paulino v. Astrue*, 2010 WL 3001752, at *18-19.

## VII. RFC/CREDIBILITY/TREATING PHYSICIAN RULE

The ALJ found, "after careful consideration of the entire record," that the

---

[8] Plaintiff erroneously claims that she was unable to attend classes in March 2010 due to inability to ambulate. (Pl.'s Brf. at 24 (citing T. 600)). The cited record does not mention ambulation difficulties at all, but states that plaintiff sought a doctor's note excusing her from school because an increase in depression prevented her from doing her work. (T. 600).

plaintiff

> . . . can occasionally lift, carry, push, and pull ten pounds; frequently lift, carry,
> push, and pull less than ten pounds. She can stand and walk for two hours in
> an eight-hour day with normal breaks. She can stand for ten to fifteen minutes
> at one time after which she would need to sit for a few minutes before
> resuming standing. She can walk five minutes at a time several times per day.
> She can sit for six hours in an eight-hour day with normal breaks with sitting
> limited to about two hours at a time at which time she would need to stand or
> walk for a few minutes before resuming sitting. She must avoid exposure to
> respiratory irritants. She can frequently but not continuously handle and finger.
> She may periodically need a cane for walking.

(T. 94-95). The ALJ's RFC finding incorporated significant limitations on the full

range of sedentary work based on plaintiff's severe knee impairment,[9] residuals of

carpal tunnel syndrome, asthma, and what the ALJ characterized as "situational

depression." He concluded that there were "no medical source statements from any

treating physicians that would support further restrictions than those incorporated

into [his RFC] assessment . . . ." (T. 99).

The ALJ found that plaintiff's "testimony as to her limitations as a result of her

knee problem is credible . . . ," but concluded that her "complaints of chronic back

pain since 2005 [were] not supported by the medical record." (T. 97). He evaluated

plaintiff's conflicting statements regarding the limitations on her ability to sit, walk,

and stand, and found that her earlier statements suggesting less substantial

limitations were most credible and consistent with other evidence of record,

including her ability to perform a full range of daily activities. (T. 95. 98-99).

---

[9] To the extent plaintiff's counsel challenged the ALJ's RFC determination based on
plaintiff's purported inability to perform the full range of sedentary work (see Pl.'s Brf. at 28),
counsel ignores that the ALJ imposed significant, additional physical and other limitations on
plaintiff's ability to perform sedentary work.

Plaintiff argues that the combination of plaintiff's pain due to problems with her knees, feet, and lower back; her morbid obesity, in combination with her spinal disorder; and her non-exertional psychiatric impairments rendered her unable to perform even sedentary work. (Pl.'s Brf. at 26, 30-32). She contends that the ALJ failed to give proper weight to the opinion of treating physicians who concluded that plaintiff had physical and psychiatric limitations that were inconsistent with the ALJ's RFC determination. (Pl.'s Brf. at 26). Finally, plaintiff argues that the ALJ arbitrarily concluded that plaintiff's earlier statements regarding the limiting effects of her impairments were more credible than later statements, ignoring the fact that plaintiff's condition deteriorated over time. (Pl.'s Brf. at

For the reasons stated below, this court concludes that the ALJ's RFC determination that plaintiff could perform significantly less than a full range of sedentary work was supported by substantial evidence. Further, the court finds that the ALJ properly evaluated the medical evidence generated by treating physicians and did not err in assessing the credibility of plaintiff's statements regarding her symptoms and limitations.

### A. Legal Standards

#### 1. RFC

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F.

Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

It is well-settled that the combined effect of all plaintiff's impairments, including obesity, must be considered in determining disability. *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995). The ALJ must evaluate the combined effect of plaintiff's impairments on his/her ability to work, "regardless of whether every impairment is severe." *Id.*

## 2. Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d

28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. §§ 404.1529(c), 416.929 (c). When the

objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### B. Analysis

#### 1. Medical Evidence/Treating Physician

In carrying out his RFC analysis, the ALJ properly considered the medical evidence with respect to all of plaintiff's significant claimed impairments. (T. 97-98). The plaintiff was seen at Champlain Valley Physician's Hospital ("CVPH") in June 2008 for, *inter alia*, severe pain in her right foot, which arose after she started working a second job in a grocery store. (T. 97, 496-518). X-rays were negative for any fractures, but showed mild osteoarthritis of the metatarsophalangeal joint. (T. 97, 508). Plaintiff was treated with a post-operative shoe and Percocet, and her foot symptoms apparently resolved after July 2008. (T. 489-90, 492, 494, 496-97, 499-500, 502, 509). Plaintiff sought treatment at the emergency room for left leg and foot pain in November 2009. (T. 97, 448-63). X-rays revealed heel spurs, but no

fracture, and an ultrasound was negative for deep vein thrombosis.  (T. 97, 448-50).

Plaintiff was prescribed Celebrex with Tylenol and instructed to ice her foot, keep it

elevated, and follow up with her primary care physician.  (T. 97, 456).  There is no

medical evidence that plaintiff was treated for problems with her feet through the

date of the ALJ's June 16, 2010 decision.  (*See, e.g.*, T. 541-42, 549-50, 617

(orthopedic surgeon Dr. Kneifel reporting "normal" calf, ankle, foot examinations

between November 30, 2009 and April 2010).[10]

    As the ALJ noted, "[t]he record documents a severe knee impairment

complicated by obesity for which she has received a significant amount of treatment,

including surgery."  (T. 97).  X-rays and MRIs in 2008 and early 2009 showed

"moderate to severe" degenerative changes in her knees.  (T. 97, T. 401-04, 406-07).

Plaintiff had arthroscopic surgery on her left knee in December 2009 (T. 418-19),

which produced some improvement; but plaintiff continued to report chronic knee

pain (T. 541, 549-50, 617).  Before and after her surgery, plaintiff pursued more

conservative treatment for her arthritis, including mostly over-the-counter pain

medication,[11] a knee brace, injections, and physical therapy, with mixed results, but

no long-term improvement.  (T. 122, 394-400, 541-42, 549-50, 617).  Her orthopedic

surgeon stated, in March 2010, that he suspected plaintiff would "eventually come to

---

[10] Plaintiff testified at the May 2010 hearing that problems with her left ankle recently recurred.  (T. 134-35).  As discussed below, she sought medical attention for pain in her right foot and Achilles tendonitis in her left foot shortly after the ALJ's decision.  Plaintiff ultimately had surgery on her left foot and Achilles tendon, in early 2012.

[11] Plaintiff declined to take Celebrex prescribed to her because of concerns about renal side effects, and relied on other less potent pain relievers such as Tylenol.  (T. 122, 125, 598, 606).

a knee replacement." (T. 549).[12] Acknowledging the medical evidence and crediting plaintiff's testimony about limitations due to her knee problems, the ALJ incorporated substantial limitations on standing and walking in his RFC determination, including a provision that she may sometimes need to use a single cane. (T. 94-95, 97, 99).

The ALJ concluded that the medical evidence did not support plaintiff's claims of chronic back pain since 2005. (T. 97). The ALJ pointed to the absence of objective findings that would indicate a serious back problem, and the medical record included no back imaging for plaintiff.[13] (T. 97). Plaintiff's counsel points to a single positive straight leg raise test[14] by a physical therapist in November 2009 as objective evidence of plaintiff's back problems. (Pl.'s Brf. at 26; T. 328). But, as the ALJ pointed out, Dr. Wassef performed a consultative orthopedic examination of plaintiff in December 2008, and noted that plaintiff's straight leg raise test was negative bilaterally. Although plaintiff complained of discomfort in her lower back, she displayed a full range of motion of the cervical, thoracic, and lumbar spines and

---

[12] Plaintiff testified, in May 2010 that her doctor was holding off on knee replacement surgery until she "gain[ed] muscle in [her] knee." (T. 121).

[13] Plaintiff told Dr. Wassef that she had an MRI of her lower back which purportedly showed "deterioration at level 7[,]" (T. 286), but there was no further evidence supporting that claim in the record. The court would note that the lower or lumbar spine only consists of five vertebrae, so the plaintiff's reference to "level 7" suggests that her report to Dr. Wassef was, at least, erroneous. *See* http://emedicine.medscape.com/article/1899031-overview (the lumbar spine consists of 5 moveable vertebrae numbered L1-L5).

[14] "The Straight Leg Raising (SLR) test has been used as the primary test to diagnose lumbar disc herniations . . . ." Majlesi J, Togay H, Unalan H, Toprak S., *The sensitivity and specificity of the Slump and the Straight Leg Raising tests in patients with lumbar disc herniation*, http://www.ncbi.nlm.nih.gov/pubmed/18391677 .

was able to perform a full squat and get on and off the examining table and out of a chair without assistance or difficulty. (T. 287-88). Plaintiff's orthopedic surgeon reported "unremarkable" or "normal" spinal screening examinations between November 30, 2009 and June 2010. (T. 541-42, 549-50, 614, 617). The ALJ also noted the plaintiff's extensive daily activities, including attending school and working part-time in child care, as evidence negating her claims of serious back problems. (T. 97, 112-15).

Plaintiff argues that the ALJ failed to account for her morbid obesity in his RFC analysis. However, as noted above, the RFC section of the ALJ's decision explicitly noted plaintiff's obesity as a factor complicating her knee problems, and the ALJ relied upon the findings of Dr. Wassef, whose report noted plaintiff's morbid obesity. (T. 97, 286). Based on the authority cited above, the ALJ appropriately considered plaintiff's obesity in reaching his RFC determination.

The ALJ noted plaintiff's diagnosis of asthma 2006 and her complaints of the residual effects of her carpal tunnel syndrome. (T. 97-98). Notwithstanding the paucity of the medical evidence indicating that plaintiff suffered significant, continuing limitations from these conditions, the ALJ nonetheless incorporated restrictions in his RFC determination to account for that possibility. (T. 94-95). It does not appear that plaintiff takes issue with this aspect of the ALJ's RFC analysis.

The ALJ's RFC analysis and other sections of his decision account for plaintiff's mental health history. (T. 93-94, 98). The ALJ noted that the consulting psychologist who examined plaintiff in December 2008 diagnosed her with

adjustment disorder with mixed anxiety and depressed mood. (T.98, 294). Dr. Hartman found that plaintiff was nonetheless able to follow and understand simple directions and instructions, and that she had a fair ability to maintain attention and concentration, maintain a regular schedule, make appropriate decisions, and relate adequately with others. (T. 294). The ALJ appropriately gave some weight to the conclusions of Ann Herrick, Ph. D. in January 2009, who reviewed plaintiff's file, but did not examine her.[15] (T. 98). Dr. Herrick concluded that plaintiff's mental health limitations were "non-severe" and that she had only "mild" restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, with no episodes of deterioration of extended duration. (T. 93-94, 306-07, 309). The ALJ noted more recent evidence of plaintiff's mental health issues, including an exacerbation of her depression in April 2009, which was effectively addressed by treatment with Zoloft. (T. 98, 464, 470).

Plaintiff argues that the ALJ failed to adequately consider the opinions of plaintiff's treating physicians, including her orthopedic surgeon, Dr. Kneifel. (Pl.'s Brf. at 26). However, plaintiff's counsel points to the treating doctors' diagnoses of particular conditions, as opposed to objective findings which indicate that plaintiff had greater limitations than reflected in the ALJ's RFC determination. (Pl.'s Brf. at 26). *Cf. Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008) ("mere diagnosis" of

---

[15] *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (ALJs must consider the findings of state agency medical consultants and other program physicians because they are highly qualified and are also experts in Social Security disability evaluations); *Diaz v. Shalala*, 59 F.3d 307, 313 n. 5 (2d Cir. 1995) (the opinions of non-examining sources may override treating sources' opinion provided if they are supported by evidence in the record).

fibromyalgia, without a finding as to the severity of the symptoms and the limitations imposed by those symptoms, does not mandate a finding of disability). The ALJ took the findings of Dr. Kneifel with respect to plaintiff's knee problems into account when formulating the extensive additional limitations on her ability to perform sedentary work. As in *Nezelek v. Astrue*, 3:05-CV-1481 (FJS/DEP), 2009 WL 1310518, at *7 (N.D.N.Y. May 8, 2009), plaintiff's counsel has attempted to "manufacture a treating physician argument" by overlooking the extent to which the ALJ accepted Dr. Kneifel's medical opinions in his RFC determination.

Plaintiff also argues that the ALJ improperly substituted his opinions for those of plaintiff's mental health providers by concluding that plaintiff's depression was "situational" and not "chronic." (Pl.'s Brf. at 26). Plaintiff was diagnosed by Dr. Hartman with adjustment disorder with mixed anxiety and depressed mood. An adjustment disorder begins in response to some specific stressful situation or circumstance or a combination of stressors.[16] The three medical reports regarding treatment of plaintiff's depression between the time of Dr. Hartman's psychiatric evaluation and the date of the ALJ's decision, involved specific stressors–relationship problems with her boyfriend (T. 470 (April 2009)), the unexpected death of plaintiff's sister-in-law (T. 545 (February 2010)), and conflict with her daughter over seeing her grandchildren and relationship problems with a man (T. 600, 604 (March 2010). The ALJ's use of the term "situational" to describe plaintiff's depression seems a fair construction of the reports of the examining/consulting

---

[16] *See, e.g.*, http://www.mayoclinic.com/health/adjustment-disorders/DS00584.

psychologist and the treating physicians, as opposed to a substituted diagnosis, particularly because plaintiff responded well to changes in her medication. In any event, even if the ALJ's characterization of plaintiff's depression was inappropriate, the few reports of treating mental health providers do not suggest limitations on plaintiff's functioning more severe than those properly determined by the ALJ based on the findings of the two consulting psychologists.

In arguing about the treating physician's rule, plaintiff's counsel also points to the report of Dr. Hinsman, who started treating the plaintiff on August 13, 2010, after the ALJ's decision had issued. (T. 61). Dr. Hinsman diagnosed plaintiff, for the first time, with Attention Deficit Disorder ("ADD"), but noted that a prescription of Strattera seemed to have improved plaintiff's attention issues. (T. 61). As discussed below, the Appeals Council properly concluded that evidence of this new diagnosis after the ALJ's decision should not be considered in reviewing that decision. In any event, given that plaintiff's ADD was being effectively treated with medication, Dr. Hinsman's diagnosis would not support a challenge to the ALJ's RFC determination.

Dr. Hinsman also diagnosed plaintiff with dysthymia,[17] and, at last report, was in the process of adjusting her medication. (T. 61). Even if this new evidence should be considered, Dr. Hinsman's report does not support an argument that plaintiff had greater mental health limitations than reflected in the ALJ's RFC determination.

---

[17] "Dysthymia . . . is a mild but long-term (chronic) form of depression. Symptoms usually last for at least two years, and often for much longer than that." http://www.mayoclinic.com/health/dysthymia/DS01111 "As one of the two chief forms of clinical depression, [dysthymia] usually has fewer or less serious symptoms than major depression but lasts longer." http://www.health.harvard.edu/newsweek/Dysthymia.htm.

## 2.    Credibility of Plaintiff's Subjective Complaints

The ALJ, applying the appropriate two-step credibility standard, concluded that plaintiff's impairments could reasonably be expected to cause the symptoms she alleged; but, the ALJ found that plaintiff's statements concerning the intensity, persistence, and limiting effect of these symptoms were not credible to the extent they were inconsistent with his RFC determination.  (T. 96).  However, the ALJ credited much of plaintiff's testimony about the extent of her limitations, including those related to her knee problems, and incorporated corresponding restrictions into his RFC finding.  (T. 97, 99).

Plaintiff testified at the hearing that she still suffered knee pain that was aggravated by walking, but acknowledged that it was not "as bad" since arthroscopic surgery on her left knee in December 2009.[18]  (T. 118-23).  She stated that she took only Tylenol for the pain and had been prescribed a cane, which she used only outside when it was damp or rainy.  (T. 119-20, 122, 125).  Plaintiff testified that she could sit for two or three hours at a time, but would need to shift around in the chair because of back pain.[19]  (T. 126).  She stated that she could stand for approximately

---

[18] Plaintiff's testimony was internally inconsistent as to whether surgery helped her knee problems, but she acknowledged improvement and reduced pain in response to several direct questions.  (T. 120-21, 122, 123).

[19] "[T]he Second Circuit has observed, '[t]he regulations do not mandate the presumption that all sedentary jobs in the United States require the worker to sit without moving for six hours, trapped like a seat-belted passenger in the center seat on a transcontinental flight.'"  *Nezelek v. Astrue*, 2009 WL 1310518, at *8 n. 8 (*quoting Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (the ALJ's finding that plaintiff can perform sedentary work if "she is given several breaks or allowed to change positions often" does not contradict the Social Security regulations defining "sedentary work")).

15 to 20 minutes, and could walk "approximately [ten], maybe five minutes" before she would have to stop. (T. 126). The ALJ's RFC determination reasonably accounted for these claimed limitations:

> She can stand and walk for two hours in an eight-hour day with normal breaks. She can stand for ten to fifteen minutes at one time after which she would need to sit for a few minutes before resuming standing. She can walk five minutes at a time several times per day. She can sit for six hours in an eight-hour day with normal breaks with sitting limited to about two hours at a time at which time she would need to stand or walk for a few minutes before resuming sitting. . . . She may periodically need a cane for walking.

(T. 94-95).

Plaintiff testified she could not "lift up to a certain amount," but declined to be more specific as to how much weight she could lift. (T. 123). In connection with her August 5, 2008 Disability Report, plaintiff reported that she could not lift more than 20 pounds. (T. 244). Plaintiff also acknowledged a range of daily activities that typically involve some lifting, including attending school, babysitting, housekeeping, and shopping.[20] (T. 95-96, 113, 114-15, 127-28). Dr. Wassef found no problems with plaintiff's upper extremities and stated that he was not "able to detect other evidence of physical limitations" beyond plaintiff's claim of discomfort in her right knee and lower back. (T. 288, 289). Given the absence of a more definitive claim from plaintiff or finding from treating doctors regarding more severe limits on her ability to lift and carry, there is substantial evidence supporting the ALJ's RFC finding that plaintiff "can occasionally lift, carry, push, and pull ten pounds [and]

---

[20] Plaintiff did testify that she did have problems "bending and picking things up" around the house. (T. 127). She also stated that she did not think she could still "lift a kid up." (T. 134).

frequently lift, carry, push, and pull less than ten pounds."[21] (T. 94).

The ALJ did discount a few aspects of the plaintiff's testimony regarding subjective symptoms and limitations. As noted above, the ALJ appropriately found that the objective medical evidence did not support plaintiff's claims of chronic and severe back pain. The ALJ also rejected plaintiff's related testimony that, because of her "pinching" low back pain, she had to keep her left arm behind her back and could not "think or concentrate." (T. 96, 131). Given the medical evidence reviewed above,[22] as well as the evidence of plaintiff's substantial daily activities (T. 95-96),[23] there was substantial evidence supporting the ALJ's determination that plaintiff's testimony was not credible in this regard.

In his credibility analysis, the ALJ addressed perceived discrepancies between plaintiff's account of her ability to lift, sit, and walk in her August/September 2008 Disability Report, her March 2009 Disability Report–Appeal, and her May 2010 hearing testimony. (T. 95, 244, 258, 262, 268). Based on the other evidence in the record, the ALJ concluded that the plaintiff's earlier statements about her physical

---

[21] As noted above, the ALJ also incorporated RFC limitations of plaintiff's ability to "handle and finger" (T. 95) based on her poorly documented claim of residual effects of carpal tunnel syndrome (T. 136, 139-40). The ALJ also included limitations on plaintiff's exposure to respiratory irritants (T. 95) based on plaintiff's history of asthma. (T. 288, 289).

[22] As noted above, an examining, consultative psychologist–Brett Hartman–found that plaintiff had a fair ability to maintain attention and concentration. Consulting psychologist Ann Herrick concluded that plaintiff had only "mild" restrictions in activities of daily living and maintaining concentration, persistence, or pace.

[23] The plaintiff acknowledged many daily activities which required an ability to focus and concentrate including attending church and school (where, *inter alia*, she successfully completed a two-year child care program in one year); babysitting; using a computer; and driving. (T. 95-96, 111-15, 126-28).

limitations were most credible and should be used to support his RFC findings. (T. 95). Plaintiff argues that the ALJ arbitrarily accepted plaintiff's original statements without acknowledging that her physical condition worsened between August 2008 and May 2010. (Pl.'s Brf. at 20-22).

However, as discussed above, the restrictions in the ALJ's RFC determination regarding lifting, standing, walking, and sitting were consistent with plaintiff's sworn hearing testimony about her limitations, with a few exceptions noted above relating to her purported chronic back pain, for which there is no medical evidence of deterioration over time. The discrepancies between plaintiff's testimony and her earlier statements were relatively minor or were clarified at the hearing.[24] The ALJ's decision to credit plaintiff's earlier statements about her limitations, to the extent they contradicted her later testimony and were inconsistent with his RFC determination, had essentially no practical impact on his RFC findings. Even if the ALJ erred by crediting earlier statements of plaintiff without giving her an adequate opportunity at the hearing to explain perceived inconsistencies, this error was harmless. *See Zabala v. Astrue*, 595 F.3d 402, 409-410 (2d Cir. 2010) (finding that remand is unnecessary, notwithstanding a legal error, where the application of correct legal principles to the record could lead only to the same conclusion).

---

[24] The ALJ's decision observed that plaintiff's March 2009 Appeals Report stated that she "could not walk." In fact, the report stated that plaintiff could not walk "longer than 5-10 minutes without being in pain" (T. 268), which was largely consistent with her hearing testimony (T. 126). In connection with her March 26, 2009 Disability Report–Appeal, plaintiff stated that she could not sit "for longer than 10-15 minutes without also getting restless." (T. 268). Plaintiff provided similar testimony at the May 20, 2010 hearing, but the ALJ clarified that the plaintiff would need to "shift around the chair a little bit" to be able to sit for two to three hours at a time. (T. 126).

The ALJ appropriately considered all of the relevant factors of a credibility analysis under 20 C.F.R. §§ 404.1529(c) and 416.929 (c). To the very limited extent that the ALJ found plaintiff's statements regarding symptoms and limitations were not credible, he was supported by substantial medical and other evidence. Notwithstanding the combination of plaintiff's impairments, including severe osteoarthritis of the knees, morbid obesity, and anxiety/depression, there was substantial evidence supporting the ALJ's determination that she could perform sedentary work, with the additional restrictions he imposed. *See, e.g.*, *Rodriguez v. Astrue*, 02 Civ. 1488, 2009 WL 1619637, at *3, 6, 16-18, 20-21 (S.D.N.Y. May 15, 2009) (ALJ properly applied treating physician rule and evaluated plaintiff's credibility, and substantial evidence supported the RFC finding that plaintiff could perform past work or other sedentary work notwithstanding plaintiff's moderately severe osteoarthritis of the knees, following arthroscopic surgery, for which he would now likely require total knee replacement and plaintiff's depression, resulting in mostly moderate or mild limitations); *Wesley v. Barnhart*, 3:05CV1030, 2007 WL 735775, at *3, 5, 7, 13 (D. Conn. Feb. 6, 2007) (upholding RFC determination that plaintiff could perform a substantially full range of sedentary work despite severe degenerative osteoarthritis of the knees for which replacement surgery was precluded because of her morbid obesity).

## VIII. USE OF THE VOCATIONAL EXPERT AT STEP FIVE

### A. Legal Standards

Once the plaintiff shows that she cannot return to her previous work, the

Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[25] are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y.

---

[25] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)).

B.    **Analysis**

Having determined that the plaintiff could not perform any past relevant work, the ALJ proceeded to determine whether there were jobs that existed in significant numbers in the national economy that she could perform. (T. 99). Based on his finding that the plaintiff could not perform substantially all of the exertional demands of sedentary work, the ALJ appropriately relied on the testimony of a vocational expert. (T. 100). The ALJ posed hypothetical questions to the vocational expert, asking if there were any "simple work" which could be performed by an individual with the same age, education, past relevant work experience, and RFC as the plaintiff. (T. 100, 143-45). The vocational expert testified that such a claimant could do "simple, sedentary occupations" and provided three examples of such jobs, specifying the number of positions that existed nationally, in New York State, and in northern New York, where plaintiff resides. (T. 144-45). The ALJ concluded that the vocational expert's testimony was consistent with the Dictionary of Occupational Titles (DOT). He further found that the additional restrictions incorporated in hypothetical questions posed by plaintiff's counsel during cross-examination were inconsistent with plaintiff's RFC and would not be adopted. (T. 100). Accordingly, the ALJ concluded, at step five of his analysis, that the plaintiff was not disabled. (T. 100).

Plaintiff argues that the ALJ erred because his hypothetical questions to the Vocational Expert did not reflect the full extent of her limitations. (Pl.'s Brf. at 35).

If hypothetical questions do not include all of a claimant's impairments, limitations and restrictions, or are otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion that the claimant is not disabled. *Melligan v. Chater*, No. 94-CV-944S, 1996 WL 1015417, at *8 (W.D.N.Y. Nov. 14, 1996); *Gladle v. Astrue*, 7:12-CV-284 (NAM), 2013 WL 4543147, at *5 (N.D.N.Y. Aug. 27, 2013). Plaintiff's hypothetical questions to the Vocational Expert (T. 143-45) closely tracked his RFC determination, which this court has already concluded is supported by substantial evidence. *See Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 114 (2d Cir. 2010) ("Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment.").

Plaintiff's counsel argues that the ALJ should have credited additional hypothetical questions to the Vocational Expert, based on plaintiff's testimony that, because of severe back pain, she needed to sit with her left hand behind her back and could not focus or concentrate. (Pl.'s Brf. at 35; T. 131, 146-48). As discussed above, however, the court has found that there is substantial evidence supporting the ALJ's determination that these statements of plaintiff were not credible. *See McConnell v. Astrue*, 2008 WL 833968, at *21 (to the extent the ALJ found that plaintiff's claims of non-exertional limitations were not credible, they were "properly disregarded" at step five). Hence, the ALJ did not err when he decided not to adopt the additional limitations suggested by the hypothetical questions posed by plaintiff's counsel. *See, e.g., Edwards v. Astrue*, 5:07-CV-898 (NAM/DEP), 2010 WL

3701776, at *14 (N.D.N.Y. Sept. 16, 2010) (the record does not support plaintiff's claim that he suffered from "severe mental impairments"; thus, the ALJ properly rejected the expert's response to the hypothetical assuming such impairments).

Plaintiff also contends that the ALJ failed to reconcile discrepancies between the testimony of the vocational expert about the jobs a person with plaintiff's limitations could perform and the requirements of those jobs, as described in the DOT. (Pl.'s Brf. at 33-35, citing *Diaz v. Astrue*, 3:11-CV-317, 2012 WL 3854958, at *5-7 (D. Conn. Sept. 5, 2012)). Social Security Ruling 00-4p provides that the adjudicator should "rely primarily on the DOT . . . for information about the requirements of work in the national economy." SSR 00-4p, 2000 WL 1898704, at *2. "When there is an apparent unresolved conflict between the [Vocational Expert] . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [Vocational Expert] evidence to support a determination . . . ." *Id.*

The DOT specifies, *inter alia*, the level of Specific Vocational Preparation (SVP) and General Educational Development (GED) required to perform each job listed therein. Appendix C of the DOT defines SVP as the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." See http://www.occupationalinfo.org/appendxc_1.html. The DOT sets out nine levels of training required to perform a job, from SVP-1, which requires training time of only a short demonstration of the job tasks, to SVP-9, which requires

training time of over ten years.  A job with an SVP-2 requires "anything beyond a short demonstration up to and including one month." *Id.*  The regulations define "unskilled work" as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time . . .  [A] person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed." *See* 20 C.F.R. §§ 404.1568(a), 416.968(a).  Using the skill level definition in 20 C.F.R. § 1568(a), the Social Security Administration has determined "unskilled" work corresponds to an SVP of 1 or 2.  *Cross v. Astrue*, 08-CV-425 (VEB), 2009 WL 3790177, at *7 (N.D.N.Y. Nov. 12, 2009) (citing SSR 00-4p, 2000 WL 1898704, at *3).  The three examples of jobs that the ALJ concluded that the plaintiff could perform,[26] required SVP level 2 and, thus, involved unskilled or simple, sedentary work, within the RFC the ALJ properly determined for plaintiff. (T. 100, 144-45).

The DOT's GED scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development, which each have five or six defined levels, with level 1 being the least demanding. http://www.occupationalinfo.org/appendxc_1.html.  For two of the three jobs identified by the Vocational Expert and the ALJ, the DOT lists a GED reasoning

---

[26] Charge Account Clerk (DOT # 205.367-014), Addresser (DOT # 209.587-010), and Order Clerk (DOT # 209.567-014).  The ALJ's decision (T. 100) had an apparent typographical error with respect to the first of these jobs, listing the DOT number for account clerk as 205.367-017, which does not correspond to any job described in the DOT.  *Cf. Petrie v. Astrue*, 412 F. App'x 401, 409-10 (2d Cir. 2011) (the ALJ's step-four analysis was not improper notwithstanding an apparent typographical error in listing the DOT code number of a job he found plaintiff could perform).

level R-3, which requires reasoning development consistent with applying "commonsense understanding to carry out instructions in written, oral, or diagrammatic form" and dealing with "problems involving a few concrete variables in and from standardized situations." *Id.* One of the three identified jobs–charge account clerk (DOT # 205.367-014)–requires a language development level of L-3[27] and a mathematical development level of M-2.[28] Otherwise, the GED levels for the three jobs identified as examples by the Vocational Expert are less demanding.

Plaintiff contends, in conclusory fashion, that "evidence, testimony, and the consultative reports" indicate that plaintiff does not have the ability to function at the R-3, L-3, and M-2 GED levels, which according to the DOT, are required to perform some of the jobs that the ALJ determined that she could handle. (Pl.'s Brf. at 35). However, as the ALJ noted in his decision, the plaintiff obtained her GED high school equivalency diploma, successfully completed a two-year child care program in one year in 2007, attended college, and held a part-time job caring for three children. (T. 95-96, 98-99). She was able to manage her money, handle shopping on her own, and drive an automobile. (T. 98, 294). Examining/consultative

---

[27] Appendix C of the DOT defines level L-3 as follows: "Reading: Read a variety of novels, magazines, atlases, and encyclopedias. Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work. Writing: Write reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech. Speaking: Speak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice."

[28] Appendix C of the DOT defines level M-2 as follows: "Add, subtract, multiply, and divide all units of measure. Perform the four operations with like common and decimal fractions. Compute ratio, rate, and percent. Draw and interpret bar graphs. Perform arithmetic operations involving all American monetary units."

psychologist Brett Hartman, Psy. D., concluded in December 2008 that, although plaintiff appeared to have mild learning deficits, she would be able to follow and understand simple directions and instructions and had a fair ability to maintain attention and concentration and make appropriate decisions. (T. 294). This court sees "no 'conflict' between the vocational expert's testimony and the DOT." *Salmini v. Commissioner of Social Sec.*, 371 F. App'x at 114.[29] Given the record evidence of plaintiff's intellectual and cognitive ability, the ALJ properly relied on the testimony of the Vocational Expert in concluding that plaintiff could perform unskilled jobs requiring an SVP level of level 2 or lower and the GED scores of 3 or lower. *See, e.g., Cross v. Astrue*, 2009 WL 3790177, at *8 (the ALJ did not err in finding that a plaintiff, who had the equivalent of a 12th grade education and who was found able to understand and follow simple directions and instructions and perform simple tasks, retained the RFC to perform unskilled work identified as SVP-1 or SVP-2 under the DOT; the finding that plaintiff could perform jobs with GED reasoning levels of R-2 or R-3 was not incompatible with the non-exertional limitations established by the ALJ that plaintiff's work must be simple, low-stress, and entry-level, with no complex decision-making, no planning, scheduling or report writing, no multi-tasking, and little change in the work environment); *Reynolds v. Commissioner of Social Sec.*, 1:11-CV-778 (NPM), 2012 WL 2050410, at *6 (N.D.N.Y. June 6,

---

[29] *Diaz v. Astrue*, 2012 WL 3854958, at *5-7, cited by the plaintiff, is readily distinguishable. In *Diaz*, the ALJ articulated plaintiff's non-exertional limitation using some of the express language of the DOT for GED reasoning level 1, but did not reconcile the inconsistency in the Vocational Expert's testimony that plaintiff could perform jobs with GED reasoning level 2. *Id.* at 5-6. There is no such inconsistency in this case.

2012) (substantial evidence in the record affirms the ALJ's finding that plaintiff, although limited to "simple" work, could perform jobs with GED reasoning levels of R-2 or R-3, because, *inter alia*, he tested beyond a twelfth-grade level in reading and had success in classes in community college and was found able to follow written instructions and interpret charts, graphs and applications; comprehend advanced information; and make inferences); *Jones-Reid v. Astrue*, 3:10-CV-1497, 2012 WL 7808094, at *26 (D. Conn. May 14, 2012) (the hypothetical limitation of only short, simple instructions is not inconsistent with either jobs requiring GED level 2 or 3 reasoning); *Jackson v. Astrue*, 06-CV-6372, 2007 WL 1428442, at *9 (W.D.N.Y. Apr. 25, 2007) (it is not evident from the current record that plaintiff, who completed the 11th grade and has years of general life experience, such as raising children, working, handling money, and maintaining a household, would be unable to meet the GED requirements of the jobs identified by the Vocational Expert–R-4 M-2 L-3 for one job and R-2 M-2 L-2 for the other).[30]

---

[30] As in *Jackson*, plaintiff's counsel does not explain why plaintiff could not perform the jobs cited by the Vocational Expert and the ALJ, other than by a conclusory reference to the entire record. *Id.* This court has found no evidence in the record to suggest plaintiff does not have the language or mathematical skills required to perform the identified jobs. (Plaintiff made one statement about her reading comprehension during the hearing in May 2010 that she would need to "reread" the local newspaper "to understand all the stories in it." Plaintiff's counsel used this inconclusive testimony to pose an unsupported hypothetical question assuming that plaintiff could only read at a 7th grade level. (T. 138, 148-49).) In any event, counsel points to only one of the three cited jobs that require a GED language level (3) and mathematics level (2), which he claims plaintiff is incapable of. (Pl.'s Brf. at 33-34). The other two jobs identified by the Vocational Expert, with a total of over 36,000 positions in New York and almost 900 positions in Northern New York (T. 144-45), have lower GED language and mathematical levels which even counsel does not argue are beyond plaintiff's ability. Even if plaintiff was not capable of performing one of the three examples of unskilled jobs cited by the Vocational Expert because of language and/or mathematical limitations, her ability to perform the other two jobs would satisfy the Commissioner's burden at step five. *See, e.g., Haskins v. Commissioner of Social Sec.*,

The court is satisfied that substantial evidence supports the ALJ's finding that plaintiff can perform alternative substantial gainful work in the national economy. Accordingly, the Commissioner sustained her burden at step five, and in finding that the plaintiff was not disabled. *See Salmini v. Commissioner of Social Sec.*, 371 F. App'x at 114 (applying substantial evidence standard in assessing whether Commissioner met her burden of proof at step five).

## IX.   NEWLY SUBMITTED EVIDENCE

Plaintiff's counsel twice submitted "update medical records" for the consideration of the Appeals Council in December 2011. (T. 14-72, 74-86). As noted above, the Appeals Council made the updated medical evidence part of the record, but concluded that it related to a time period after the ALJ's decision and did not effect the determination as to whether plaintiff was disabled as of June 16, 2010. (T. 2, 6). In April 2013, well after this district court action was commenced, plaintiff's counsel again submitted additional medical records relating to the time period between the ALJ's decision and the Appeals Council's denial of review, and asked the court to consider them in reviewing the ALJ's decision. (Dkt. No. 14). Very recently, plaintiff's counsel advised the court that the Commissioner had approved plaintiff's re-application for SSI benefits, finding her disabled as of January 2013, and asked this court to remand the case to the ALJ who found that

---

5:05-CV-292 (DNH/RFT), 2008 WL 5113781, at *11 (N.D.N.Y. Sept. 11, 2008) (two of the three jobs identified by the Vocational Expert exceeded plaintiff's RFC; however, because there were approximately 1,000 positions in the local economy for the remaining job identified by the expert that plaintiff could perform, the ALJ's reliance on the erroneous portion of the expert's testimony constituted harmless error).

plaintiff was not disabled as of June 2010 so that he could conduct a new hearing taking the subsequent determination into account.  (Dkt. Nos. 19, 21).

This court finds that substantial evidence supported the Appeal Council's determination that the medical evidence corresponding to the time period after the ALJ's original determination was not material to the issue of whether she was disabled as of June 16, 2010.  The new evidence first submitted by plaintiff to the district court was also not material to the ALJ's disability determination, and counsel also failed to show good cause for not submitting it to the Appeals Council before its decision.  Finally, the court finds that the Commissioner's subsequent determination that plaintiff was disabled approximately two and one-half years after the ALJ's original determination, based on new medical evidence, reflecting at least one new impairment and significant worsening of previously-existing impairments over time, does not warrant a remand.

### A.    New Evidence First Submitted to the Appeals Council

"While evidence submitted to the Appeals Council becomes part of the administrative record, *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir.1996), the Appeals Council . . .  will consider new evidence only if (1) the evidence is material, (2) the evidence relates to the period on or before the ALJ's hearing decision,[31] and (3) the

---

[31] Plaintiff's counsel misconstrues *Pollard v. Halter*, 377 F.3d 183, 191 (2d Cir. 2004) to support his suggestion that the court should look at the date the Appeals Council denied review, not the date of the ALJ's decision, as the end of relevant time frame to which "new" evidence must be material.  *Pollard* held that "a 'final decision' by the SSA is rendered when the Appeals Council either considers the application on the merits or declines a claimant's request for review, and not simply when the ALJ issues its decision."  That holding, however, was in the context of deciding whether to apply a SSA rule that became final between the time of the ALJ's decision and the Appeals Council decision.

Appeals Council finds that the ALJ's decision is contrary to the weight of the evidence, including the new evidence." *Rutkowski v. Astrue*, 368 F. App'x 226, 229 (2d Cir. 2010); 20 C.F.R. §§ 404.970(b), 404.976(b), 416.1470(b), 416.1476(b); *see also Baladi v. Barnhart*, 33 F. App'x 562, 564 (2d Cir. 2002) (new evidence forms part of the administrative record under review "only to the extent that it relates to the time frame encompassed in the ALJ's decision"). "Materiality requires that the new evidence not concern 'a later-acquired disability or the subsequent deterioration of the previous non-disabling condition.'" *Pearson v. Astrue*, 1:10-CV-521 (MAD), 2012 WL 527675, at *11 (N.D.N.Y. Feb. 17, 2012) (*citing Estevez v. Apfel*, 97 Civ. 4034, 1998 WL 872410, at *7 (S.D.N.Y. Dec. 14, 1998)). Where, as here, the Appeals Council determined that the new evidence submitted did not relate to the period on or before the ALJ's decision, "[t]he role of the district court is to determine if the Appeals Council erred when it determined that the new evidence was insufficient to trigger review of the ALJ's decision." *Pearson v. Astrue*, 2012 WL 527675, at *11 (*citing Edwards v. Astrue*, 5:07-CV-898 (NAM/DEP), 2010 WL 3701776, at *7, n. 12 (N.D.N.Y. Sept. 16, 2010)).

Plaintiff complained of a recurrence of pain in both feet on June 25, 2010–shortly after the ALJ's decision. (T. 614). An X-ray of her right foot on that date showed mild degenerative changes very similar to those shown on X-rays in June 2008. (T. 508, 616). Plaintiff's orthopedic surgeon diagnosed her with left Achilles tendonopathy and suggested physical therapy and consideration of using an "equalizer boot." (T. 615).

The medical records first submitted by plaintiff to the Appeals Council (T. 14-72) do not reflect any further treatment of plaintiff's right foot pain after August 2010.[32] (T. 50, 60). Her Achilles tendonitis appeared to worsen in July 2011, resulting in increased pain and ambulation with a limp.[33] (T. 37, 39-40, 46-48). An MRI in August 2011 first showed extensive osteoarthritis in plaintiff's left foot. (T. 42-43). As discussed below, plaintiff ultimately had surgery on her left foot/Achilles tendon in February 2012.

The updated medical records that plaintiff first submitted to the Appeal Council evidenced a worsening of plaintiff's knee problems as of late 2011. X-rays showed degenerative disease in plaintiff's left knee that was worsening in severity (compared to 2009 x-rays), and plaintiff reported that her knee pain had gotten worse. (T. 19, 30). Plaintiff requested a referral to her orthopedic surgeon for a left knee replacement, which she had discussed, but not actively pursued, during the period prior to the ALJ's June 2010 decision. (T. 34).

As documented by the medical records submitted to the Appeal Council, plaintiff saw Dr. Hinsman starting in August 2010, and he diagnosed plaintiff with Attention Deficit Disorder ("ADD") for the first time. (T. 61). Plaintiff thereafter showed improved concentration with medication. (T. 47, 61, 84-85).

---

[32] The documents first submitted to the district court include a doctor's report referencing plaintiff's right foot in September 2010 and a follow-up report a year later that treatment with a carbon fiber insert was going well. (Dkt. No. 14 at 9, 11).

[33] The medical records provided by plaintiff to the Appeals Council do not appear to show any doctor's visits regarding her left Achilles tendonitis between August 2010 and July 2011. (T. 37, 39-40, 46-48, 50, 60, 65-66). The documents first submitted to the district court show treatment of plaintiff's left Achilles tendonitis in September 2010. (Dkt. No. 14 at 11-12).

The medical records first submitted by plaintiff to the Appeals Council reflected a significantly different diagnosis for her left foot problems–Achilles tendonitis–than was presented in the medical records prior to the ALJ's decision. (T. 449-50 (diagnosing heel spurs).[34]  Moreover, plaintiff's Achilles tendonitis got markedly worse and caused increased pain and limitations in ambulation in July 2011–a year after the ALJ's decision.  Similarly, the new medical evidence reflects that plaintiff's knee problems worsened in the Fall of 2011–more than a year after the ALJ's determination that plaintiff was not disabled.  Finally, the new medical evidence introduced an entirely new mental health diagnosis–ADD–although, as noted above, that condition was successfully treated with medication and did not impose any significant lasting limitations on plaintiff.

Given the diagnoses of new impairments and the substantial time that passed between the ALJ's determination and the deterioration of plaintiff's pre-existing, non-disabling impairments that may have resulted in more substantial limitations, the evidence submitted to the Appeals Council was not material to whether plaintiff was disabled on or before June 16, 2010.  Accordingly, the Appeals Council's decision not to consider this evidence of plaintiff's later medical history was supported by

---

[34] "A heel spur is a bony projection that often protrudes from the medial calcaneal tubercle on the plantar surface (bottom portion of the heel bone)." http://progressivepodiatryny.com/main/foot-conditions/treatment-of-heel-spurs-plantar-fasciitis/. Plaintiff's Achilles tendonitis also eventually manifested itself in a Haglund's Deformity, which is also a bone spur, but which appears on the upper back of the heel.  (Dkt. No. 14 at 8).  *See* http://progressivepodiatryny.com/main/foot-conditions/achilles-tendonitis-haglunds-deformity/.

substantial evidence. *See, e.g.*, *Baladi v. Barnhart*, 33 F. App'x at 563-64;[35]

*McGannon v. Colvin*, 5:12-CV-359 (GLS), 2013 WL 1296383, at *3 (N.D.N.Y. Mar.

28, 2013) (additional evidence submitted to the Appeals Council that deterioration of

plaintiff's back condition did not occur until early 2011 does not suggest greater

limitations than those found in the ALJ's decision in September 2010); *Pearson v.

Astrue*, 2012 WL 527675, at *12 (evidence of deterioration of plaintiff's carpal

tunnel syndrome after the ALJ rendered the decision is not material new evidence)

(*citing Quinlivan v. Comm'r of Soc. Sec.*, 08-CV-1175, 2011 WL 2413491, at *8

(N.D.N.Y. May 23, 2011) (if the plaintiff suffered an aggravation of an impairment

after the ALJ's decision, the proper remedy would be to submit a new application).[36]

## B. New Evidence First Submitted to the District Court

A case may be remanded to the Commissioner for reconsideration based on

---

[35] On January 8, 1998, an ALJ found that Baladi, despite complaints of back pain and mild dysthymia, was not disabled. Before the Appeals Council reached a final decision, a State agency granted plaintiff's new application for SSI benefits, based on an alleged mental affective disorder, finding plaintiff disabled as of March 26, 1998, the day he began receiving psychiatric treatment. Plaintiff submitted, to the Appeals Council, evidence of this grant of benefits, as well as a report from the clinical social worker from whom he had been receiving treatment. The Second Circuit held that "[n]either [the later administrative] determination [of disability], nor the evidence that a clinical social worker had diagnosed plaintiff with depression as of that date (but made no conclusion about his condition prior to that time), necessarily relates to whether plaintiff was disabled as of January 8, 1998, and any inference that can be drawn is too weak to displace the substantial evidence supporting the ALJ's determination." *Id.*

[36] This court recognizes that medical and other evidence that postdates an ALJ's decision is not irrelevant per se. *See Pollard v. Halter*, 377 F.3d at 193 (2d Cir. 2004). However, determining whether evidence generated after an ALJ's decision is material to the plaintiff's condition on or before the date of that decision is necessarily very fact-specific. *Pollard* held that certain medical and educational evidence relating to the time period after the ALJ's decision was relevant to the determination that the juvenile plaintiff's functional limitations were, as his mother had previously claimed, more serious at and before the time of the ALJ's determination. *Id.* at 193-94. Given the dramatic differences in the factual contexts of *Pollard* and this case, this Second Circuit precedent is readily distinguishable.

new evidence first submitted to the district court if the plaintiff is able to show that the new evidence "is material and that there [wa]s good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). To carry this burden, a plaintiff must show that "(1) the proffered evidence is new and not merely cumulative of what is already in the record; (2) the proffered evidence is material, meaning that it is (a) relevant to his condition during the time period for which benefits were denied; (b) probative; and (c) reasonably likely to have influenced the Commissioner to decide his application differently; and (3) good cause exists for his failure to present the evidence earlier." *Mulrain v. Commissioner of Social Sec.*, 431 F. App'x 38, 39 (2d Cir. 2011).

The evidence first submitted by the plaintiff to the district court primarily involved additional medical records dated between the time of the ALJ's June 2010 decision and the Appeal's Council's July 2012 denial of review, relating to plaintiff's problems with left Achilles tendonitis, culminating in surgery for a Haglund's Deformity in February 2012. (Dkt. No. 14). As noted above, plaintiff's Achilles tendonitis first surfaced shortly after the ALJ's decision, and it did not result in any substantial pain or limitations until more than a year after the ALJ's decision. Thus, this "new" evidence is not material to plaintiff's condition through the time of the ALJ's determination that plaintiff was not disabled. Moreover, plaintiff's counsel failed to demonstrate good cause for not submitting these medical records, along with the other updated medical records, to the Appeal Council before its July 2012

decision.[37]  (Dkt. No. 14 at 1).  Accordingly, this court declines to consider these records in reviewing the ALJ's decision.

### C.    Evidence of the Subsequent Disability Determination

There is "some doubt," in this circuit and in the federal courts more broadly, as to whether and under what circumstances a disability determination resulting from a re-application for benefits should be considered new evidence warranting a remand to the Commissioner to reconsider a prior finding that a claimant is not disabled. *Davidson v. Colvin*, 1:12-CV-316 (MAD/VEB), 2013 WL 5278670, at *10 (N.D.N.Y. Sept. 18, 2013).  *Compare e.g., Perry v. Astrue*, 5:11-CV-74 (GLS), 2012 WL 280738, at *2 n.7 (N.D.N.Y. Jan. 31, 2012) (although plaintiff's subsequent application for benefits was granted, this decision is of no moment to the court's review of the ALJ's decision in this case) with *e.g., Mikol v. Barnhart*, 554 F. Supp. 2d 498, 503-04 (S.D.N.Y. 2008) (if the ALJ reviewing a subsequent claim references material relating to the period covered in the first claim, the later decision is considered new and material evidence, warranting a remand with respect to the first claim).  *See also Perry v. Astrue*, 10-11004, 2012 WL 645890, at *11 (D. Mass. Feb. 27, 2012) ("The mere fact that a second ALJ weighed the evidence differently does not authorize reversal by a district court; the standard is whether the first ALJ's decision was supported by substantial evidence on the record, not whether it was the

---

[37] Plaintiff's counsel merely apologized for the late submission of these records, claiming he just recently learned of them. *Id.*

only possible reasonable decision.").[38]

Given the limited nature of a "substantial evidence" review, this court finds the reasoning of District Judge Woodlock of Massachusetts in the *Perry* case to have considerable persuasive force. The court reviewing whether an initial determination is supported by substantial evidence should consider new evidence that may have been before a later adjudicator to the extent that is material to the issue of whether plaintiff was disabled at the time of the original determination. However, the ultimate finding of the later adjudicator would seem to have little, if any, marginal probative value in reviewing the original determination, particularly in a case such as this, where there is only a subsequent administrative finding of disability, and not an ALJ's decision which spells out the basis for the later determination.

As discussed above, this court has concluded that the medical evidence submitted by counsel regarding plaintiff's condition after the ALJ's decision did not undermine the substantial evidence supporting the ALJ's determination that plaintiff was not disabled as of June 16, 2010. That an adjudicator, considering the new evidence and, perhaps, some of the prior evidence before the original ALJ, subsequently found plaintiff disabled as of January 2013 would not provide any basis for a remand based on *Perry* and the other authority cited therein by Judge Woodlock.

However, this court would reach the same result applying the line of cases

---

[38] Plaintiff's September 30 and October 2, 2013 letter brief cites cases from other circuits supporting remand based on evidence of a subsequent disability determination. (Dkt. Nos. 19, 21).

from this district which have suggested that, under some circumstances, a remand based on a later disability determination may be appropriate. As discussed above, during the two and one-half years between the original ALJ's decision and the subsequent determination of disability, plaintiff developed at least one new impairment, and pre-existing impairments that had not been disabling through the date of the ALJ's decision significantly worsened. *See, e.g.*, *Duross v. Commissioner of Social Sec.*, 1:05-CV-368, 2008 WL 4239791, at *5 (N.D.N.Y. Sept. 11, 2008) (a subsequent administrative determination that plaintiff was disabled is not relevant to the review of whether plaintiff was disabled at the time of the original ALJ's decision, because the later decision encompasses a different time period, some different impairments, and some different medical evidence); *Gladle v. Astrue*, 7:12-CV-284 (NAM), 2013 WL 4543147, at *3-4 (N.D.N.Y. Aug. 27, 2013) (declining to reverse an ALJ's finding that plaintiff was not disabled based on a subsequent determination of disability which addressed a time period after the first ALJ's decision and relied on evidence probative of that time period, including evidence that plaintiff had developed an additional severe impairment and that plaintiff's condition had progressively worsened). *See also Baladi v. Barnhart*, 33 F. App'x at 563-64 and note 35, above.[39] Moreover, as of the January 2013 onset date

_____

[39] The Second Circuit in *Baladi*, noted that the plaintiff relied primarily on the new medical evidence submitted to the Appeals Council about plaintiff's mental impairment in arguing that substantial evidence did not support the original ALJ's determination that plaintiff was not disabled. *Id.* at 563-64. The panel also noted that the subsequent administrative determination that plaintiff was disabled did not undermine the basis for the original ALJ's contrary finding; but the panel did not hold that such a subsequent determination might have some independent probative value.

related to the recent disability determination, plaintiff had turned 50 years old (T. 239), which put her into a different age category that impacted her ability to perform other sedentary work. *See* 20 C.F.R. Pt. 404, Subpt. P, App., § 201.00 (g) ("Individuals approaching advanced age (age 50-54) may be significantly limited in vocational adaptability if they are restricted to sedentary work."). *See also Bruton v. Massanari*, 268 F.3d 824, 827 (9th Cir. 2001) (holding that the district court did not err in denying the plaintiff's motion to remand his initial application in light of a later award of benefits based on his second application because the second application involved different medical evidence, a different time period, **and a different age classification**).

  **WHEREFORE,** based on the findings in the above Report, it is hereby

  **RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint **DISMISSED**, and it is further

  **RECOMMENDED**, that plaintiff's Letter Motion Requesting Consideration of Subsequent Fully Favorable ALJ Decision (Dkt. No. 19) be **DENIED**.

  Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. Given that the recent lapse in funding of the federal government has resulted in the furlough of most attorneys for the government handling civil litigation, the deadline for filing objections for the Commissioner only will be stayed and reset to 14 days following the return to work of furloughed workers upon restoration of funding. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14**

**DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d

85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d

15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  October 18, 2013


Hon. Andrew T. Baxter
U.S.  Magistrate Judge